2006 WY 96

**Donald R. FOOTE, Jr., Appellant (Plaintiff),**

v.

**Ronald L. SIMEK, as owner of the Mountain Meadow Ranch, Appellee (Defendant).**

No. 05–203.

Supreme Court of Wyoming.

Aug. 4, 2006.

Laurence W. Stinson of Bonner Stinson, P.C., Powell, Wyoming; and Matthew D. Winslow of Winslow Law Firm, P.C., Cody, Wyoming, for Appellant. Argument by Mr. Stinson.

Andrea L. Richard of The Richard Law Firm, P.C., Jackson, Wyoming, for Appellee.

Before VOIGT, C.J., and HILL *, KITE, and BURKE, JJ., and ARNOLD, D.J.

VOIGT, Chief Justice.

[¶ 1] The district court granted summary judgment to the owner of a ranch where an employee was injured while replacing a gasket on a pivot irrigation system. It concluded that the ranch's owner did not breach his duty to provide the employee a reasonably safe workplace or to warn the employee of unsafe work conditions, and that the employee's decision to replace the gasket by himself was an intervening cause of the employee's injuries. We find that genuine issues of material fact exist as to both of these issues. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## ISSUES

[¶ 2] The dispositive issue in this appeal is whether genuine issues of material fact exist on the "breach of duty" and "causation" elements of the employee's cause of action.

## FACTS

[¶ 3] Ronald Simek (the owner) owns a "recreational ranch" near Cody.[1] He hired his grandson, Ben Simek (the manager), to manage the ranch—the manager's duties included irrigating the hay fields, harvesting the crops, general ranch responsibilities, and ensuring that ranch employees had whatever they needed safely to perform their jobs. Donald Foote (the employee) was hired as a ranch laborer in early 2002—his duties included monitoring, cleaning, and maintaining the ranch's pivot irrigation system, lawn care, and essentially whatever else the manager "asked him to do."

[¶ 4] In late August or early September 2002, a substantial leak developed near the endgun of a pivot system the ranch used to irrigate the "race field," a hay field where the ranch also hosted "grass" snowmobile races each March and October. It appears that a blown gasket needed to be replaced. The manager had replaced this kind of gasket once or twice prior to September 2002. However, the employee had never replaced such a gasket and acknowledged that the manager "knew more about [replacing the gasket] than I did. I just knew that it had to be replaced. I wouldn't know the specific details until [the irrigation system] was taken apart." [2]

---

* Chief Justice at time of oral argument.

1. It appears that the ranch's only economic function was to grow and sell hay, but the owner indicated that there was "no profit," the ranch was not operated as a "profit center," and any income generated from selling hay was "not important."

2. The employee was not familiar with pivot irrigation systems prior to his employment at the ranch.

[¶ 5] On September 18, the manager told the employee to begin his customary morning chores when he arrived for work the next day, and also to prepare to replace the endgun gasket. The employee stated that the manager's instructions were essentially as follows: "we're" going to replace the gasket "first thing" and "we" need to complete the task (or the task "had" to be completed) the next morning. The employee understood this to mean that he and the manager would work together (as they had on other projects) to replace the gasket; yet, he also understood that replacing the gasket was the next morning's "primary goal," that it had been "prioritized," and (based on his prior work history with the manager) that the employee should complete the task even if the manager was not ultimately available to help the employee. The manager agreed that he told the employee that "we" will replace the gasket the next day and that "we needed to get it done," but he apparently did not give the employee any further instructions on how to perform the task. When asked if he warned the employee of any safety issues or "something [the employee] needed to watch out for or be concerned about" while replacing the gasket, the manager replied "[j]ust that it takes two guys to do it." The manager felt that this statement made it clear to the employee that he should not attempt to replace the gasket alone.

[¶ 6] Between 7:30 a.m. and 8:00 a.m. on September 19, the employee assembled the new gasket, a loader, an extension ladder, and tools in the race field. He "wanted" the manager to help him replace the gasket, and the manager was the only person who could assist the employee that day. The manager lived on the ranch, so the employee rang the manager's doorbell, which had become the employee's "morning routine to get [the manager] out of bed." No one answered the door, and the employee continued to work on other projects. Between 8:45 a.m. and 9:00 a.m., the employee again rang the manager's doorbell, and received no answer—the employee stated that this was the "same reply as every other day I tried getting [the manager] out of bed." The employee returned to the manager's house at about 10:00 a.m. and spoke with the manager's three-year-old stepdaughter. He asked her if the manager was out of bed, and the stepdaughter replied that he was not,[3] so the employee told the stepdaughter to inform the manager that the employee was "on the race field."

[¶ 7] The employee ultimately decided to replace the gasket on his own. He drained the pivot system, briefly reviewed a manual, positioned the bucket of the loader eighteen to twenty feet above the ground, and used the extension ladder to climb into the bucket. The employee then disassembled the irrigation system near the location of the blown gasket. In doing so, he released the tension that held the entire apparatus together. It began to oscillate and then came apart, knocking the employee backwards into the bucket, where he struck and injured his back.[4]

[¶ 8] In March 2003, the employee sued the owner,[5] alleging negligence in failing to warn the employee of the dangers associated with replacing the endgun gasket, in failing to provide another laborer to help the employee replace the gasket, and in failing adequately to train and supervise the employee.[6] The owner filed a motion for summary judg-

---

3. The employee added that when he encountered the manager's wife later that day, she was upset because the stepdaughter was to be at daycare by 9:00 a.m., and she and the manager "didn't get out of bed to take [her]." However, the manager claimed that he got up between 7:00 a.m. and 8:00 a.m. that morning and went to the site where he was having a new house built.

4. In his complaint, the employee alleges that he suffered a herniated disc, as well as a disc protrusion, which would probably require future surgery.

5. It is undisputed in this case that the owner is ultimately liable for any negligence attributable to the manager. *See generally Case v. Goss,* 776 P.2d 188, 192 (Wyo.1989); *Abeyta v. Hensley,* 595 P.2d 71, 73–74 (Wyo.1979).

6. The employee also sought punitive damages for the owner's "willful violation of the public trust" in failing "to carry insurance on the ranch or to advise employees that the ranch does not participate in the Wyoming Workers' Compensation fund or have insurance coverage sufficient to insure employees' medical bills were paid in the event of injury." Neither party raises an appellate issue concerning this claim.

ment in August 2004 in which he argued that the employee's "decision to change the gasket alone, by himself, instead of waiting for [the manager], as instructed, was the proximate cause of the [employee's] alleged injury." In December 2004, the owner filed a supplemental pleading wherein he cited *Mellor v. Ten Sleep Cattle Co.*, 550 P.2d 500 (Wyo.1976), and further claimed that he was not negligent because the employee's "injuries were caused by the risks and dangers that arose in the progress of the work he was performing." The district court ultimately granted summary judgment to the owner, and the employee now appeals that decision.

## STANDARD OF REVIEW

[¶ 9] "The elements of a prima facie case of negligence are duty, breach, causation and damages." *Franks v. Indep. Prod. Co.*, 2004 WY 97, ¶ 9, 96 P.3d 484, 489 (Wyo.2004). "Summary judgment is not favored in negligence actions, since such actions by their nature are factually dependent"; "summary judgment in negligence actions is [therefore] subject to more exacting scrutiny." *Id.* Our standard of review is as follows:

> Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." W.R.C.P.

56(c). A genuine issue of material fact exists when a disputed fact, if proven, would establish or refute an essential element of a cause of action or a defense that a party has asserted. *Metz Beverage Co. v. Wyoming Beverages, Inc.*, 2002 WY 21, ¶ 9, 39 P.3d 1051, ¶ 9 (Wyo.2002).

> We evaluate the propriety of a summary judgment by employing the same standards and by examining the same material as the district court. *Id.* We examine *de novo* the record, in the light most favorable to the party opposing the motion, affording to that party the benefit of all favorable inferences that may be drawn from the record. *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 229 (Wyo. 2000). If upon review of the record, doubt exists about the presence of issues of material fact, that doubt must be resolved against the party seeking summary judgment. *Id.* We accord no deference to the district court's decisions on issues of law. *Metz,* ¶ 9.

*Linton v. E.C. Cates Agency, Inc.*, 2005 WY 63, ¶¶ 6–7, 113 P.3d 26, 28 (Wyo.2005).

## DISCUSSION

[¶ 10] The district court essentially analyzed two elements of the employee's negligence cause of action for purposes of summary judgment: whether there was "a breach of duty on the part of the [owner]" and, if so, whether that was "the proximate cause" of the employee's injury.[7] It first

---

**7.** The district court held two hearings on the summary judgment issue. It initially held a hearing on the owner's summary judgment motion December 15, 2004, after which hearing it orally granted the owner's motion. In January 2005, the employee filed a sworn declaration, developed his argument regarding the district court's application of *Mellor* to the circumstances of the instant case (which issue the owner had raised in a supplemental pleading filed the day before the first summary judgment hearing), and asked the district court to reconsider its ruling. The employee renewed that request in March 2005. The district court held a hearing April 12, 2005 to consider the employee's request, after which hearing the district court orally denied that request. In doing so, the district court elaborated slightly on its decision to grant the owner summary judgment; however, the district court essentially ruled that the owner remained entitled to summary judgment for the

same reasons that it had stated after the first summary judgment hearing. The employee filed his notice of appeal July 1, 2005. An order granting the owner summary judgment, and denying the employee's reconsideration request, was ultimately filed August 12, 2005.

We have subsequently held that motions to reconsider are a "nullity." *Plymale v. Donnelly*, 2006 WY 3, ¶¶ 5–10, 125 P.3d 1022, 1023–25 (Wyo.2006). However, the owner does not question either the propriety of the district court's, or this Court's, consideration of the employee's sworn declaration, or of this Court referring to the district court's reasoning based on that declaration. There also appears to be no jurisdictional issue concerning the employee's appeal in this case to the extent that the employee appeals from the district court's grant of summary judgment to the owner (as opposed to the denial of his reconsideration request), and the owner does not contend otherwise. *See Mueller v. Zimmer*, 2005 WY

determined that there were no genuine issues of material fact. Relying on *Mellor*, it then concluded that: (1) the danger that the employee encountered "arose in the course of the work"—there was no threat or danger to the employee until he began dismantling the irrigation system by himself; and (2) the owner "complied with" his duty—there was nothing "that the [owner] failed to do that the [owner] should have done, or anything that the [owner] did that . . . [he] should not have done or that was negligent." In the alternative, the district court found that the owner had no reason to anticipate that the employee would replace the gasket by himself, and that the employee's decision to do so was therefore an intervening cause of the employee's injuries.

[¶ 11] A good portion of the parties' appellate argument focuses on the district court's reliance on *Mellor*. In *Mellor*, 550 P.2d at 502, the employee was injured while helping his employer and another individual move a heavy cabinet. The employee "was accustomed to this kind of general handyman employment," knew how heavy the cabinet was, and "was familiar with all of its other physical characteristics." After lifting the cabinet from the floor to an upright position, they began "walking" the cabinet towards the wall because the cabinet was so heavy that they could only move it a short distance at a time. While the individuals were taking a five to ten minute break, "the cabinet suddenly, and without warning, fell backward" and seriously injured the employee. *Id.* The employee sued the employer and, after a bench trial, the trial court concluded that the employer was not negligent and that the employee "was contributorily negligent and/or assumed the risk inherent in the moving operation." *Id.* at 503.

[¶ 12] On appeal, the employee questioned whether the record was sufficient to support the trial court's findings. He first claimed that the employer "violated his duty of care . . . by failing to furnish him a safe place to work, the result of which caused injury." *Id.* at 503. We began our discussion by stating the following general principles:

It is the duty of the employer to furnish the employee a safe place to work and that duty of care must be reasonable in view of the work to be performed and the dangers incident to the employment.

We said in *Engen* [*v. Rambler Copper & Platinum Co.*, 20 Wyo. 95, 121 P. 867 (1912)]:

" . . . It is the duty of the master, in the performance of such nondelegable duties to exercise ordinary or reasonable care, or, as otherwise expressed, the care and skill that a man of ordinary prudence would observe under the circumstances. And it is generally held that it is the master's duty for the protection of his employees to exercise such care and skill in the following particulars, among others: (1) To furnish them with reasonably safe machinery, appliances, tools, and place to work, and to keep the same in reasonably safe repair. (2) To employ competent and sufficient employees with whom to work . . ."

The master is not, however, liable for a failure to furnish a safe place to work if the complaint centers upon a danger which the employer does not know of and concerning which he is not chargeable with knowledge, or which arises in the progress of the work and constitutes part of its details and risks. We said as much in *Engen*:

" . . . The duty of the employer to guard his workmen against unnecessary and unreasonable risks extends, not only to those that are known to him, but also to such as a reasonably prudent man, in the exercise of ordinary diligence, would know or discover, having regard to the danger to be avoided . . ." "As to this matter, however, there exists a well-recognized distinction between *defects or dangers which arise in the progress of the work and constitute part of its details and risks, and those which do not. If the defect belongs in the for-*

---

156, ¶¶ 5–7, 124 P.3d 340, 346–48 (Wyo.2005); and W.R.A.P. 2.04 (premature notice of appeal "shall be treated as though filed on the same day as entry of the appealable order, provided it complies with Rule 2.07(a)").

*mer class, the master is not liable; ...*" [Emphasis supplied]

*Id.* at 503–04 (footnotes and internal citations omitted).[8] We then applied those principles as follows:

In the instant matter, the cabinet being moved was the thing that caused the harm. It really was not the *place* where the plaintiff was required to work that was the cause of the injury.

Be that as it may—the danger and the cause arose during the progress of the work and constituted a part of its details and risks and thus is an exception to the safe-place-to-work requirements.

Another factor requires mention and is one which, we think, prevents this appeal from being rescued by the safe-place-to-work theory. There is no evidence in this record to show what caused the cabinet to fall. Negligence cannot be presumed from the mere happening of the accident. It stood there for from five to ten minutes before falling, and when it did, it fell without warning. It is contended that [another individual] was leaning on the cabinet and that this was the cause of its fall. This was rank speculation. There is no proof of this, and to just say it—without proof—does not constitute a causative fact to which we will assign credibility. There was insufficient proof to establish that [the other individual's] leaning on it was the cause. Therefore, the [employer] could hardly be held to have known of the danger.

If we, in hindsight, do not know what caused the cabinet to fall—how can [the employer], with foresight, be held to have been able to anticipate what the cabinet would do?

*Id.* at 504 (footnotes and internal citations omitted).

[¶ 13]  The employee also claimed that the employer was negligent for "not employing more men and having safety devices on the job." Our conclusion on that issue was as follows:

We cannot say that the [employer] was negligent as a matter of law for not employing more men and having safety devices on the job. This we would have to do if we were to overrule the fact-finding trial court on this issue.

We recognize that the care required is commensurate with the danger involved. But the trial court held the defendant to have discharged his duty of care under the facts.

We have to ask—what would more tools or men have done to protect the [employee]? Would additional men not have been doing the same thing the [employee] and the [employer] were doing—taking a break while the cabinet stood motionless—until it fell for an unexplained reason? Nobody anticipated this unfortunate happening—including the [employee]—and there is no reason to believe that the employer should have anticipated the necessity of more tools and more men in order that this operation would be conducted safely. There were enough tools and men. The problem was that nobody anticipated the happening—nor were they bound to have anticipated it.

*Id.* at 504–05.[9]

[¶ 14]  In the instant appeal, the employee contends that our analysis in *Mellor* was

---

**8.**  These general principles appear to be consistent with those found in Restatement (Second) of Agency §§ 492–93, 495, 498–99, 505–07, 510 (1958), though neither party refers to these provisions in their appellate briefing. The following section is particularly relevant to the district court's reasoning in this case:

§ 499.  Risks Inherent in Enterprise
A master who has performed his duties of care is not liable to a servant harmed by a risk incident to the nature of the work.
The commentary to this section states that a "master performs his duties to his servants if he provides conditions which are as safe as the nature of the work reasonably permits." Restatement (Second) of Agency, *supra*, § 499 cmt. a.

**9.**  The employee further argued that the district court's assumption of risk and contributory negligence findings were not supported by the record or were contrary to law. We stated that there was "no need for us to make detailed inquiry into the facts and law" because we had held that the employer was "not negligent"; it therefore did not matter "whether the [employee] was contributorily negligent or whether he assumed the risk inherent in the moving opera-

essentially "based upon the doctrines of assumption of risk and contributory negligence." He claims that the district court therefore improperly relied on *Mellor* in granting the owner summary judgment because "the holding in *Mellor* was abrogated by the adoption [of] comparative fault." [10] We agree that, to the extent *Mellor* relied upon the doctrines of assumption of risk and contributory negligence, its reasoning did not survive the adoption of comparative fault. [11] Furthermore, the issues in the instant case should be presented to the jury under the latter construct.

[¶ 15] The circumstances that led to the "no negligence" finding in *Mellor* were quite limited in scope, as well as substance—after the employee, the employer, and another individual lifted a cabinet to an upright position and moved it towards the wall, the cabinet (now stationary while the movers took a break) spontaneously fell on the employee for no apparent reason. We are presented with a different scenario in the instant case. This case is not one in which the "danger and cause" arose solely "in the progress of the work." In arriving at that conclusion, the district court focused too narrowly on the fact that the pivot system came apart as it was being dismantled by the employee. The primary consideration in this case is, instead, the conduct that preceded that occurrence, and the resulting "danger" (if any) that the employee would attempt to replace the gasket by himself.

[¶ 16] Unlike *Mellor*, we also cannot conclude, as a matter of law, that the owner did not breach his duty to the employee in the instant case. We find that genuine issues of material fact exist that preclude granting the owner summary judgment on that basis. [12] The question of breach is often considered to be one of fact. *See generally Johnson v. Reiger*, 2004 WY 83, ¶ 23, 93 P.3d 992, 999 (Wyo.2004); *Lee v. LPP Mortg. Ltd.*, 2003 WY 92, ¶ 20, 74 P.3d 152, 160 (Wyo.2003); and *Jones v. Chevron U.S.A.*,

---

tions." *Id.* at 505. Nevertheless, we continued by stating the following:

> We say only, with respect to the contributory negligence-assumption of the risk contention, that we have considered it and, according to the facts and the applicable law, would also affirm the trial court's rejection of this contention for the reason that the appellant is specifically excluded from recovery under the doctrine of *Berry v. Iowa Mid–West Land and Livestock Co.*, Wyo., 424 P.2d 409, 411, where we held:
>
> > ... Under the circumstances of this particular case, however, we can say it is apparent that if defendant's omission is assumed to constitute negligence, then the acts of plaintiff would necessarily and as a matter of law amount to contributory negligence.
>
> Where a danger is as open and obvious to the servant as to the master, or where the servant has better means of knowledge than the master, he will be charged with such negligence as to bar recovery.
>
> In Restatement Second, Agency 2d § 521, p. 489 (1958), it is given as a rule that a master is not liable to a servant for harm caused by unsafe conditions of employment, if the servant, with knowledge of the facts and understanding of the risks, voluntarily enters or continues in the employment. Also, this court adopted the following rule with respect to risks assumed by an employee:
>
> > A servant assumes (1) the risk of such dangers as are ordinarily and normally incident to his occupation, and a workman of mature years is presumed to know them, whether he

does or not; (2) such extraordinary or abnormal risks—usually, at least, arising out of the negligence of the master—the conditions and dangers of which he (a) knows and appreciates and faces without complaint, or the conditions and dangers of which (b) are so obvious and apparent that an ordinarily careful person would, under the circumstances, observe and appreciate them. * * *.

*Id.* (some internal citations and quotations omitted).

10. For a more detailed explanation of these concepts and each concept's relationship to the other concepts, *see generally Betts v. Crawford*, 965 P.2d 680, 686–87 (Wyo.1998); *Halpern v. Wheeldon*, 890 P.2d 562, 565 (Wyo.1995); *Barnette v. Doyle*, 622 P.2d 1349 (Wyo.1981); and Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2005).

11. The underlying legal precepts—(1) an employer owes a duty to his employees to provide a safe workplace, and (2) an employer who has performed that duty is not liable to the employee for harm caused by risks incident to the nature of the work—do, however, remain viable. *See, for instance*, Restatement (Second) of Agency, supra, §§ 492 and 499.

12. We further note that the evidence presented in the instant case, when viewed in a light most favorable to the employee, is not such that we are forced to presume negligence merely "because an accident happened." *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 520 (Wyo.1994).

718 P.2d 890, 897 (Wyo.1986). This is particularly true when "there appears to be no great disagreement about the evidentiary facts, but the evidence is subject to conflicting interpretations or reasonable minds might differ as to its significance...." *Roussalis v. Wyoming Med. Ctr., Inc.*, 4 P.3d 209, 229 (Wyo.2000). *See also Bettencourt v. Pride Well Serv.*, 735 P.2d 722, 726 (Wyo. 1987) (issue should be submitted to the fact-finder if reasonable minds could reach different conclusions and inferences from facts, even when facts bearing upon negligence are undisputed).

[¶ 17] Whether the owner breached his duty to provide the employee a reasonably safe workplace or to warn the employee of unsafe work conditions in the instant case is inextricably intertwined with the circumstances surrounding the employee's decision to replace the endgun gasket by himself. Perhaps the best illustration of the factual issues that are apparent in these circumstances is the manner in which each party emphasizes the evidence, and the reasonable inferences to be gleaned therefrom, in his appellate briefing. For example, the employee emphasizes his work history *vis a vis* the ranch manager. He claims that the manager was often unavailable (whether due to sleeping,[13] watching television, or other reasons) to assist with tasks the manager and the employee were scheduled to perform jointly.[14] This resulted in a "custom and practice" at the ranch that essentially "required" the employee to perform these joint tasks on his own—the employee understood that when the manager was unavailable, he was "still to get it done" and when he received no answer at the manager's house, he was to "go about [his] business." According to the employee, the manager was aware of this practice.

[¶ 18] On the day the employee was injured, he simply "decided to proceed as [he] would on any other day and complete the chores" by himself. It also appears that the employee felt some urgency to replace the gasket that morning.[15] The employee's position is that the manager knew or should have known, based on the aforementioned practice and the priority that the manager placed on completing the task, that the employee would attempt to replace the gasket himself if the manager was not available. That being the case, the employee was "never instructed not to change [the endgun] by [himself]" and the manager (who had replaced this kind of gasket before) failed adequately to warn the employee (who had never replaced this kind of gasket) of the dangers of replacing the gasket alone.

[¶ 19] The owner, in turn, emphasizes other aspects of the employee's work history in which the employee worked jointly with the manager, especially on tasks that the employee had not previously completed. For example, the manager trained the employee to perform daily maintenance on the pivot irrigation system when the employee was initially hired. The manager told the em-

---

13. According to the employee, the manager was a "late sleeper [who] doesn't want to get out of bed"—the manager had "a sleeping disorder of stays up late and sleeps even later" and it was "common" for him to not get up in the morning.

14. The employee provided several examples of joint tasks that he often completed on his own due to the manager's unavailability: (1) lubricating and changing oil and filters on farm equipment, and greasing "zerk fittings"; (2) loading and stocking hay for buyers; (3) digging a trench for water and electrical lines to the manager's house; (4) working with a contractor to "stand" exterior walls at the manager's new house; (5) placing six-inch pipe in the race field; (6) moving a horse "lean-to" with a contractor; and (7) selecting and sorting trees for landscaping. However, the employee does not distinguish which of these tasks, if any, he either had been trained to perform or had performed previously.

15. The reasons for this sense of urgency vary: (1) the manager prioritized the task for completion the morning the employee was injured; (2) the employee knew that all the chores, including replacing the gasket, needed to be completed before a large truck arrived to be loaded with hay that day; (3) the hay in the race field needed water in order to grow—the owner agreed that without water, the hay would not grow as fast, but indicated that this would not substantially impact the ranch because the income from selling hay was not important, and the manager agreed that ensuring that the irrigation system was working sometimes became a high priority; and (4) the leak was "tearing a rut right through the [race] field" where they typically held snowmobile races in October—the owner and the manager acknowledged that it is desirable to have a fairly smooth field without a lot of ruts in it for snowmobile races.

ployee how the control box and tires worked, and how to maintain the system, check the fluids, and clean the filters and sprinkler heads. Then, after a "couple of walkthroughs," the employee "was turned loose on [his] own." The employee also worked "side by side" with the manager for almost two weeks while installing a water line in the race field. The employee had never installed a water line and the manager was his "guidance" (the manager explained "[t]his is how we do it, and this is why we do it"). The two apparently completed this project just prior to September 19, 2002.

[¶ 20] The owner also points to the manager's testimony that he told the employee that "it takes two guys" to replace the endgun gasket. The employee acknowledged that he understood that he and the manager were to perform the task together (as they had in the past when the employee had not previously performed a certain task), the employee acted consistently with that understanding when he attempted to contact the manager to help him replace the gasket, and no one at the ranch expressly directed the employee to replace the gasket alone. Accordingly, the owner contends that the employee, who had never replaced this kind of gasket and stated that the manager "knew more about it than [the employee did]," became "frustrated and impatient" [16] and acted independently in deciding to replace the gasket alone. The employee's decision was also contrary to the manager's express instruction.

[¶ 21] It is apparent from both hearing transcripts that in granting the owner summary judgment, the district court essentially adopted the owner's characterization of the facts. Because this characterization is not the only reasonable inference that can be drawn from the evidence presented, summary judgment was inappropriate. Any doubt in that regard must, according to our standard of review, be resolved in favor of the employee.

[¶ 22] The employee also contends that these same issues of fact preclude granting the owner summary judgment on the causation element. He argues that the owner's breach of his duty to the employee was the "proximate cause" of the employee's injuries, especially in light of the aforementioned practice that the employee would perform joint tasks on his own if the manager was unavailable to help the employee. The owner asserts that the employee's "independent decision to change the . . . gasket himself, in spite of the fact that he knew it was a two-person job that he was instructed to perform with" the manager, was an intervening cause of the employee's injuries.

▬▬▬▬ "Proximate cause" is explained as "the accident or injury must be the natural and probable consequence of the act of negligence." *Bettencourt v. Pride Well Service, Inc.*, 735 P.2d 722, 726 (Wyo.1987); *followed in, Natural Gas Processing Co. v. Hull*, 886 P.2d 1181, 1186 (Wyo.1994); *Lynch v. Norton Const., Inc.*,

---

16. The owner relies on the following testimony for the proposition that the employee became frustrated and impatient:

[The owner's counsel]. And then you understood that after you finished your chores and got things prepped, you were going to go get [the manager] so you and he would change the gasket on the endgun?
[The employee]. Correct.
Q. You would do it together, work together like you'd worked on prior occasions, such as laying the pipe; correct?
A. Yes.
Q. I take it, then, at some point you became somewhat impatient when [the manager] didn't answer the door?
A. Yeah. It was kind of frustrating, but it was normal.
Q. And you decided, [t]he heck with it, I'm just going to go do it?

A. Correct.
Q. And then you go up to the endgun after you become frustrated and impatient; correct?
A. Yes.
* * *
Q. . . . And you think you would do it the same way today that you did it on September 19, 2002, if you were to change the gasket on an endgun?
A. Everything, but I would have more help.
Q. Like what you had planned on doing on September 19, 2002; correct?
A. Correct.
Q. Okay. You would be more patient this time? In other words, in waiting—
A. I was patient then. I don't want you to misinterpret that I was impatient. I was frustrated, but this is a daily occurrence.

861 P.2d 1095, 1099 (Wyo.1993). The ultimate test of proximate cause is foreseeability of injury. *Stephenson v. Pacific Power & Light Co.,* 779 P.2d 1169, 1178 (Wyo. 1989). In order to qualify as a legal cause, the conduct must be a substantial factor in bringing about the plaintiff's injuries. *Natural Gas Processing Co.,* 886 P.2d at 1186; *Stephenson,* 779 P.2d at 1178.

* * *

Proximate cause is a question of fact in the usual case, reserved for the determination by the trier of fact, unless the evidence is such that reasonable minds could not disagree. *Duncan v. Town of Jackson,* 903 P.2d 548, 553 (Wyo.1995); *Downen,* 887 P.2d at 520; *Lynch,* 861 P.2d at 1099. *Turcq v. Shanahan,* 950 P.2d 47, 51–52 (Wyo. 1997) (internal citation omitted). An "intervening cause,"

if not reasonably foreseeable, will relieve a defendant of liability. *Stephenson,* 779 P.2d at 1178. We have defined an intervening cause as

one that comes into being after a defendant's negligent act has occurred * * *. [The intervening cause] is reasonably foreseeable if it is a probable consequence of the defendant's wrongful act or is a normal response to the stimulus of the situation created thereby.

*Century Ready–Mix [v. Campbell County Sch. Dist.],* 816 P.2d [795,] 802 [ (Wyo. 1991) ] (quoting *Buckley v. Bell,* 703 P.2d 1089, 1092 (Wyo.1985)).

*Lynch v. Norton Constr.,* 861 P.2d 1095, 1099 (Wyo.1993).

[¶ 23] We agree with the employee. In order to determine whether it was foreseeable that the employee would attempt to replace the gasket by himself, one must necessarily resolve the same factual issues that we previously discussed herein. The evidence is such that reasonable minds could disagree as to its effect, and each party obviously emphasizes the same facts in arguing the causation issue as he did in arguing the breach of duty issue.

[¶ 24] Having found that genuine issues of material fact preclude granting the owner summary judgment in this case on the bases

relied upon by the district court, we reverse and remand for further proceedings consistent with this opinion.