DAVIS, Chief Justice.
[¶1] Pioneer Homestead (Pioneer) is a non-profit corporation that operates low-income housing for senior citizens and persons with disabilities in Teton County. In 2005, Pioneer completed construction of its third apartment building, Pioneer Homestead III (PH III), and in 2013, it learned of a binding door and plaster cracks in a PH III unit. Upon investigation, Pioneer found numerous design deficiencies in the PH III plans, as well as deviations from those plans in the building's construction.
[¶2] In 2015, Pioneer sued Sargent Engineers, Inc. (Sargent) for professional negligence in the structural engineering services it provided during the design phase of PH III's construction, and Zeist Construction Management, LLC (ZCM) for breach of contract.[1] Sargent moved for summary judgment, asserting that Pioneer's claims against it were time-barred, and the district court granted that motion. We find that disputed issues of material fact exist with respect to when Pioneer reasonably should have discovered Sargent's alleged negligence, and we therefore reverse.
ISSUE
[¶3] Pioneer presents a single issue for our review, which we restate as:
*1077 Were there disputed issues of fact that precluded the district court from ruling that Pioneer's claims were time-barred as a matter of law?
FACTS
[¶4] Pioneer operates Teton County's only low-income housing development. Its complex consists of three apartment buildings that offer seventy-eight one-and-two-bedroom independent-living apartments. PH III has twenty-five units, and is Pioneer's most recently constructed building.
[¶5] The construction of PH III began in April 2004 when Pioneer entered into a design/build contract with Idaho-based Superior Modular Systems (SMS). Pursuant to that contract, SMS was to supply modular units that were constructed off-site, deliver them to the PH III building site, and put them together there. Pioneer separately contracted with ZCM to manage the PH III project, and SMS separately contracted with Sargent to provide the required structural engineering plans and specifications for the project.
[¶6] On June 1, 2004, Sargent issued a stamped set of plans and specifications for the PH III project. The project then proceeded, and on August 15, 2005, after construction was completed, a certificate of occupancy was issued for the building. Pioneer then began accepting residents for the twenty-five PH III units.
[¶7] Pioneer encountered issues with PH III at three different times after it was occupied. The first of the concerns occurred in 2006, when residents of PH III noticed noises coming from the attic and wall spaces in the building. Pioneer investigated and found that birds were getting into the building through a vent that, due to an installation error, was stuck in an open position that allowed birds to enter that space. The vent was repaired, and birds were not thereafter able to enter the attic.
[¶8] The next concern was encountered in 2007. In the summer of that year, Pioneer's property managers noticed some concrete cracking underneath a steel support beam in a covered parking area on the property's north side. Upon learning of the cracking, Pioneer notified SMS, which then notified Sargent. It was ultimately determined that the steel beam in question was improperly attached to the concrete in a manner that failed to account for the expansion and contraction that would occur with temperature fluctuations. When the beam expanded and contracted, it caused the concrete to crack and weakened its load-bearing capacity.
[¶9] Sargent examined the defect, and on October 23, 2007, sent a letter to Pioneer explaining its observations and offering a solution for the problem. In response, Pioneer retained another engineer, F. Richard Scheerer of G & S Structural Engineers, to review Sargent's proposed solution. Mr. Scheerer visited the apartment building, observed the problem, reviewed Sargent's proposal, and agreed that Sargent's solution was an "appropriate fix." Pioneer then made Sargent's recommended repair.
[¶10] The final and most recent issue with PH III, which led to the present dispute, arose in the late spring of 2013 when Pioneer received a complaint from a PH III resident in Unit 210. The resident reported a gap in a corner of that unit's drywall that was large enough to pass fingers through, and a sticking door. In response, Pioneer retained Y2 Consultants, Inc. (Y2), an engineering firm, to inspect the unit and determine the cause of those problems. Y2 performed a site visit on June 4, 2013, and reviewed the plans and specifications and performed its own calculations. On July 16, 2013, Y2 provided a written report of its findings, which were that there were significant design flaws in the plans and specifications for PH III, and defects in its construction.
[¶11] On April 7, 2015, Pioneer filed a complaint against ZCG and Sargent.[2] The complaint asserted a claim for breach of contract against ZCG and a claim of professional negligence against Sargent. As to the claim against Sargent, the complaint alleged:
*1078 26. Defendants Sargent Engineers, Inc. and Kari Moulton breached their duties in numerous respects including, without limitation:
a) Failing to design a properly sized glue laminated beam at the north carport entrance;
b) Failing to specify proper connections of the glue laminated beam;
c) Including a roof truss design with an inadequate snow load capacity;
d) Failing to specify proper and workable lateral connections between each modular unit;
e) Failing to calculate proper dead weight loads for the north wall of the structure; and
f) Failing to design a proper or adequate seismic and wind resistance system for the structure.
27. As a result of the negligence of Defendants Sargent Engineers, Inc. and Kari Moulton the Pioneer Homestead III building was damaged by buckling floors in some units, cracked interior sheetrock at some locations, shifting door frames throughout, and shifting unit walls along hallways.
[¶12] On July 8, 2016, Sargent filed a motion for summary judgment, contending that Pioneer's claims against it were barred by the two-year statute of limitations applicable to claims for professional errors and omissions. Pioneer opposed Sargent's motion with affidavits by Harry Lawroski, the Pioneer board member who oversaw the PH III project, and Jeffrey Hobson, the Y2 structural engineer who evaluated the PH III plans and specifications. Based on those affidavits, Pioneer argued that questions of disputed fact concerning whether Sargent's negligence was reasonably discoverable within the two-year period of limitations precluded summary judgment.
[¶13] On December 12, 2016, the district court issued its summary judgment ruling, which granted Sargent's motion. The court did not specifically discuss Pioneer's supporting affidavits, but concluded:
For an extension of the two-year limitation to apply under Wyo. Stat. Ann. § 1-3-107(a)(i), the Plaintiffs have the burden of establishing either that the alleged act, error or omission was not reasonably discoverable within a two (2) year period; or that the claimant failed to discover the alleged act, error or omission within the two (2) year period despite the exercise of due diligence. Wyo. Stat. Ann. § 1-3-107(a)(i)(A) and (B). In this case, the Plaintiffs have not provided any admissible evidence showing that either of the exceptions under Wyo. Stat. Ann. § 1-3-107(a)(i) applies to the claims asserted against Defendants Sargent and Moulton in this case. The licensed or certified professional services (e.g ., the plans and specifications) provided by Defendants Sargent and Moulton were completed and available to Plaintiffs as of June 4, 2004. The Court finds and concludes as a matter of law that the claims asserted by the Plaintiffs against Defendants Sargent and Moulton are barred by the statute of limitations.
[¶14] On January 18, 2017, the district court issued a final order granting summary judgment to Sargent.[3] Pioneer thereafter filed a timely notice of appeal to this Court.
STANDARD OF REVIEW
[¶15] This Court reviews a district court's grant of summary judgment as follows:
We review a district court's order granting summary judgment de novo and afford no deference to the district court's ruling. Thornock v. PacifiCorp , 2016 WY 93, ¶ 10, 379 P.3d 175, 179 (Wyo. 2016). This Court reviews the same materials and uses the same legal standard as the district court. Id . The record is assessed from the vantage point most favorable to the party opposing the motion ..., and we give a party opposing summary judgment the benefit of all favorable inferences that may fairly be drawn from the record. Id . A material fact is one that would have the effect of establishing or refuting an essential *1079 element of the cause of action or defense asserted by the parties. Id .
White v. Wheeler , 2017 WY 146, ¶ 14, 406 P.3d 1241, 1246 (Wyo. 2017) (quoting The Tavern, LLC v. Town of Alpine , 2017 WY 56, ¶ 46, 395 P.3d 167, 178-79 (Wyo. 2017) ).
DISCUSSION
A. Two-Year Statute of Limitations and Exceptions
[¶16] Wyo. Stat. Ann. § 1-3-107 sets the statute of limitations for professional negligence claims, and it provides in relevant part:
(a) A cause of action arising from an act, error or omission in the rendering of licensed or certified professional or health care services shall be brought within the greater of the following times:
(i) Within two (2) years of the date of the alleged act, error or omission, except that a cause of action may be instituted not more than two (2) years after discovery of the alleged act, error or omission, if the claimant can establish that the alleged act, error or omission was:
(A) Not reasonably discoverable within a two (2) year period; or
(B) The claimant failed to discover the alleged act, error or omission within the two (2) year period despite the exercise of due diligence.
Wyo. Stat. Ann. § 1-3-107 (LexisNexis 2017).
[¶17] The section 107(a)(i) exceptions to the two-year statute of limitations incorporate Wyoming's discovery rule. Adelizzi v. Stratton , 2010 WY 148, ¶ 16, 243 P.3d 563, 567 (Wyo. 2010). Under the discovery rule, "a statute of limitation is triggered when a plaintiff knows or has reason to know of the existence of a cause of action." Robert L. Kroenlein Trust v. Kirchhefer , 2015 WY 127, ¶ 16, 357 P.3d 1118, 1124 (Wyo. 2015) (quoting Redland v. Redland , 2012 WY 148, ¶ 54, 288 P.3d 1173, 1186 (Wyo. 2012) ). The limitations clock begins to run "when a reasonable person should have been placed on notice of his claim." Kroenlein Trust , ¶ 16, 357 P.3d at 1124 (quoting Moats v. Prof'l Assistance, LLC , 2014 WY 6, ¶ 21, 319 P.3d 892, 897 (Wyo. 2014) ).
[¶18] Pioneer's claim of negligence against Sargent is based entirely on Sargent's work on the plans and specifications for PH III, which Sargent completed in June 2004. The question is not therefore whether Pioneer's complaint was filed within two years of the alleged errors or omissions. It clearly was not. The question is instead whether Pioneer reasonably should have discovered its claims against Sargent before 2013. More particularly, under the summary judgment framework governing this appeal, the question is whether Sargent established that there were no disputed issues of fact concerning the answer to that question. We conclude that it did not.
B. Application of the Discovery Rule
[¶19] We have recognized that application of the discovery rule is "a difficult candidate for summary judgment." Kroenlein Trust , ¶ 31, 357 P.3d at 1128.
The application of the discovery rule to a statute of limitations involves a mixed question of law and fact; consequently, the entry of summary judgment on the issue of when a statute of limitations commences to run is typically inappropriate. See , e.g. , Cathcart v. Meyer , 2004 WY 49, ¶ 30, 88 P.3d 1050, 1062-63 (Wyo. 2004) ; Murphy v. Housel & Housel , 955 P.2d 880, 883 (Wyo. 1998). The question can only be resolved as a matter of law if uncontroverted facts establish when a reasonable person should have been placed on notice of his claim. Hiltz v. Robert W. Horn, P.C. , 910 P.2d 566, 569 (Wyo. 1996).
Kroenlein Trust , ¶ 31, 357 P.3d at 1128.
[¶20] Sargent contends that the engineering design defects on which Pioneer based its negligence claims were readily apparent on the face of the plans and therefore should have been discovered much earlier than 2013. In so arguing, Sargent concedes that the defects would be readily apparent only to a professional reviewing the plans, but it contends there were incidents before 2013 that should have placed Pioneer on inquiry notice and prompted it to have such a review conducted. We will therefore address each incident *1080 cited by Sargent and the facts it offers for each.[4]
[¶21] As we turn to these incidents and Sargent's designation of undisputed facts, we reiterate that we must view the record from the vantage point most favorable to Pioneer, the nonmovant, and give it the benefit of all favorable inferences that may fairly be drawn from the record. See White , ¶ 14, 406 P.3d at 1246. Additionally, "[i]f multiple reasonable inferences may be drawn from a particular fact, that fact is not a basis for summary judgment." Id . ¶ 37, 406 P.3d at 1251. Where "there appears to be no great disagreement about the evidentiary facts, but the evidence is subject to conflicting interpretations or reasonable minds might differ as to its significance," the question remains one that must be submitted to the trier of fact. Amos v. Lincoln Cty. Sch. Dist. No. 2 , 2015 WY 115, ¶ 21, 359 P.3d 954, 960 (Wyo. 2015) (quoting Foote v. Simek , 2006 WY 96, ¶ 16, 139 P.3d 455, 461-62 (Wyo. 2006) ).
1. 2004-2005: Defects Identified During Construction
[¶22] In support of its argument that Pioneer was placed on inquiry notice during the construction of PH III, Sargent points to defects Pioneer's expert Y2 identified in its 2013 review of the plans, specifications, and construction of PH III. It argues:
The undisputed facts demonstrate the first complaint Appellants had with Appellees' work on the project was an allegation that "certain straps and posts were not called out in the plans or built as specified" and "there were no overturning holdowns called out in the plans between floors, allowing the building to oscillate in wind and seismic events and causing cracking." ... The fact that certain hold-down straps contained in the design were unconstructable because other mechanical or structural components of the building were in the way must have been identified at the time of construction. Appellees performed no on site work, or any consultation after it provided the plans on June 4, 2004. However the project owner (Appellant), or its agents who performed the work, could not have completed construction without being aware of this situation. ... Once an alleged defect was identified, a reasonable property owner would have investigated further, including obtaining consultation from another engineer if they did not have the requisite knowledge or expertise to do so on their own.
[¶23] This argument fails on a number of grounds. First, the construction of the modular units was done by Pioneer's contractor, SMS, and that construction was done at an SMS facility. SMS constructed the units and was solely in charge of placing them on the foundation and piecing them together. The record contains no evidence that SMS identified the cited defect or understood its ramifications relative to wind and seismic events. One might infer that SMS must have recognized the problem during construction, as urged by Sargent, but it is also plausible that SMS employees were unaware of either the defect or its importance. On summary judgment, Sargent is not entitled to the favorable inference that the defect was identified and understood during construction.
[¶24] Additionally, the record is clear that SMS was Pioneer's contractor. Even if one could infer that SMS identified a design defect during construction, Sargent cites to no evidence that SMS acted as Pioneer's agent or in any other capacity by which SMS's knowledge could be imputed to Pioneer. Sargent likewise points to no evidence that ZCM, who served as Pioneer's construction manager, had knowledge of these defects during construction. At the very least, questions of material fact remain on the question of whether Pioneer had notice of any design *1081 defects during the construction of PH III or was put on inquiry notice.
2. 2006: Birds in the Attic
[¶25] Sargent next contends that in response to the 2006 incident in which birds were found in the PH III attic, a reasonable owner would have ordered a professional review of the PH III engineering design, plans, and specifications. We conclude that Pioneer submitted evidence sufficient to preclude summary judgment based on this incident.
[¶26] In his affidavit in opposition to summary judgment, Harry Lawroski stated the following concerning the 2006 incident:
11. In around 2006, residents of PH III noticed noises coming from the attic and wall spaces in the building. It was quickly determined that birds were getting into these areas and causing the noise, and the problem was just as quickly remedied.
12. At my deposition, upon questioning by counsel for Sargent Engineers, I testified briefly about this issue, and indicated that there was "some separation" that allowed the birds to get into the southeast corner of the building. In response to the question: "Was (sic.) there any repairs or corrective action taken as a result of that situation?" I responded: "I think they plugged up the holes."
13. I was a bit loose with my terminology during my testimony. There was no "separation," in the sense that no hole had opened up in the side of the building as the result of any settling or structural problem. The birds were getting in through a vent that had been installed incorrectly. Due to the installation error, the vent was stuck in the open position, providing an opening allowing the birds to get in. It was easily remedied and has not been a problem since.
14. The Pioneer Homestead Board did not in any way question the structural engineering work of Sargent upon discovering that a faulty vent had let some birds in.
[¶27] Viewing this evidence in the light most favorable to Pioneer, it is at least clear that reasonable minds might differ on whether birds in the attic should have alerted Pioneer to the need for a professional review of the PH III engineering design and specifications. The 2006 incident therefore did not provide a basis for summary judgment in favor of Sargent.[5]
*1082 3. 2007: Cracking Concrete in Covered Parking Area
[¶28] Sargent next contends that the 2007 discovery of cracking concrete in the covered parking area on the north side of PH III should have placed Pioneer on notice that it needed a professional review of the engineering design, plans, and specifications. We again disagree that this provides a basis for summary judgment.
[¶29] Pioneer submitted two affidavits in opposition to this summary judgment ground, the affidavit of Jeffrey Hobson, the Y2 structural engineer who reviewed the plans in 2013 and identified the defects, and Harry Lawroski. We will begin with Jeffrey Hobson's affidavit.
[¶30] In his affidavit and attached report, Mr. Hobson identified a number of deficiencies in the PH III plans and specifications and detailed those with specificity. He further stated:
11. None of the above problems with Sargent's calculations and design have any connection to the concrete breakout issue that occurred in 2007. Sargent has incorrectly stated this concrete failure is spalling, but spalling is a different type of concrete failing than what has occurred. The concrete breakout failure was caused by tension loads. The fact that a particular steel beam was improperly fixed to the concrete wall beneath, and failed to take into account the expansion and contraction that would occur with temperature fluctuations. When the beam expanded and contracted, it caused the concrete to crack, weakening this load-bearing feature and risking a catastrophic failure. This was an isolated problem, with a relatively easy repair.
12. The discovery of the concrete breakout issue would not have led a reasonable engineer to question Sargent's separate design and engineering calculations for the gravity or lateral load systems of the building. Those more serious issues could not have been reasonably anticipated, and were not identified until 2013, when, in response to complaints about a door sticking and a cracking and separation in one unit, we recommended and conducted a thorough investigation into the plans and engineering calculations that had been performed by Sargent.
13. That investigation took our office several weeks. It required a detailed review of all of the plans and supporting engineering calculations. That effort was not something that any reasonable person would have undertaken just because an unrelated concrete spalling condition had been discovered on one beam in the parking garage.
[¶31] Sargent contends that the Hobson affidavit is conclusory and therefore cannot provide a basis to find a disputed issue of fact.[6] We disagree. A conclusory affidavit is one that states conclusions or opinions without any underlying facts or basis. Braunstein v. Robinson Family Ltd. P'ship, LLP , 2010 WY 26, ¶ 14, 226 P.3d 826, 832 (Wyo. 2010). Mr. Hobson's affidavit plainly states underlying facts and an underlying basis for his conclusions that the 2007 and 2013 incidents were unrelated and the 2007 incident would not have caused a reasonable person to undertake a full-scale review of PH III plans and specifications.[7]
[¶32] Even if we were to ignore Mr. Hobson's affidavit, Pioneer also submitted Mr. Lawroski's affidavit on this question. Mr. Lawroski's affidavit described the 2007 issue and the steps Pioneer took to address it. Specifically, Pioneer contacted SMS, who then contacted Sargent. Sargent then investigated the problem and proposed a solution. The letter from Sargent to Pioneer explaining its findings and proposed solution was *1083 attached to Mr. Lawroski's affidavit. Sargent advised (emphasis added):
Thank you for bringing to our attention the spalling concrete at the steel beam bearing location at the Pioneer Homestead III project in Jackson, WY. Sargent Engineers has reviewed the calculations and construction documents for the project. In addition, Kari Moulton a principal in our Driggs office, visited the project site on September 26 to observe the concrete spalling in the foundation wall and to observe other structural components of the project for signs of cracking or spalling. The amount of plate bearing and undamaged concrete at the beam pocket was observed. No other non-shrinkage cracks or spalls in the concrete were noted at other locations on the project during the site visit .
Based [on] findings from the site visit and subsequent calculations, the concrete wall has adequate bearing at the undamaged section behind the anchors for the vertical load from the steel beam. However, the anchor capacity has been reduced due to the spalled section. It is recommended that the weld beads at the sides of the beam to the bearing plate be removed allowing the beam to slide on the seat. The spalled section of wall should then be repaired by using non-shrink grout to fill the spalled concrete section tight up against the embedded plate and flush with the adjoining wall. As there is still adequate bearing at the beam pocket, this would likely be all that would be necessary to repair the damaged section .
However, to insure that lateral loads are not transferred to the embedded plate; and to provide[ ] a completely redundant system of vertical and out of plane load transfer we recommend the addition of a steel angle with epoxy bolts embedded into the concrete wall adjoining the spalled section at the beam pocket. Details outlining the grout repair and installation of a stiffened steel angle are provided herewith.
[¶33] Pioneer then hired another engineer, G & S Structural Engineers, to review Sargent's findings and recommendations, and G & S confirmed that Sargent's solution would likely be effective. The G & S correspondence with Pioneer was also attached as an exhibit to Mr. Lawroski's affidavit.
[¶34] Pioneer's evidence thus showed that Sargent itself reviewed the 2007 problem, used language suggesting the problem was an isolated one, and offered a repair, which it described as "all that would be necessary," and that an independent engineer verified the findings and the fix. Considering this evidence in the light most favorable to Pioneer, we have no difficulty concluding that reasonable minds might very well differ on the question of whether the 2007 issue should have prompted Pioneer to undertake a full-scale professional review of the PH III design, plans, and specifications.
[¶35] The affidavits of Mr. Hobson and Mr. Lawroski, and the attached exhibits, make it clear that genuine issues of material fact exist concerning the question of when Pioneer knew or should have known that it needed to investigate defects in the design and construction of PH III.
C. Controlling Precedent
[¶36] As a final matter, we address Sargent's argument that the outcome of this appeal should be controlled by our decision in Lucky Gate Ranch, L.L.C. v. Baker & Assoc., Inc. , 2009 WY 69, 208 P.3d 57 (Wyo. 2009), and that Lucky Gate compels a decision affirming the district court's entry of summary judgment. In Lucky Gate , we held that a party who knows of his claim cannot delay filing his complaint until his damages have fully developed. Id. ¶ 20, 208 P.3d at 65.
As a general rule, where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not required that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date. The act itself is regarded as the ground of the action, and is not legally severable from its consequences.
*1084 Id. (quoting Duke v. Housen , 589 P.2d 334, 343 (Wyo. 1979) ).
[¶37] Our holding in Lucky Gate applies where a single wrongful act results in some immediate damages and some future damages. Lucky Gate , ¶ 22, 208 P.3d at 65. For example, in Lucky Gate , where the claim was for a single breach of contract, we said:
All of Lucky Gate's damage claims are founded upon the breach of contract that occurred in May 2004. Future damages arising from that breach do not create new causes of action. To allow successive actions as additional damages arise would nullify the statutes of limitation and defeat their very purpose.
Lucky Gate , ¶ 22, 208 P.3d at 65 (quoting Duke , 589 P.2d at 343-44 ) (internal citations and quotation marks omitted).
[¶38] The question is whether the same alleged act, error, or omission, supra ¶18, caused the 2006 birds in the attic, the 2007 cracking concrete, and the 2013 structural damages. See Heimer v. Antelope Valley Improvement & Serv. Dist. , 2010 WY 29, ¶ 29, 226 P.3d 860, 866 (Wyo. 2010) ; Bredthauer , 824 P.2d at 561-63. That is a question of fact unless the undisputed facts show otherwise. Heimer , ¶ 30, 226 P.3d at 866.
[¶39] Our decision in Heimer is instructive. In Heimer , the plaintiffs' home suffered subsidence damage that plaintiffs suspected was due to a leak in the defendant's water main. Heimer , ¶ 20, 226 P.3d at 864. The plaintiffs delayed filing their claim against the defendant until they could determine if defendant's leaking water main was in fact the cause of their damages. Id . While the plaintiffs continued their investigation, the defendant's water main broke, increasing the damages to the plaintiffs. Id . ¶ 10, 226 P.3d at 862. We held:
Although the circumstances presented in the instant case are different, the reasoning in Waid is instructive and informs our decision here. The alleged error made by the governmental entity in Waid was the improper design of the culvert. That error was discoverable after the first flood and, consequently, the limitation period began at that time. The fact that the plaintiffs suffered additional damages as the result of a second flood did not change the time when the governmental entity's act, error or omission was discoverable. In the instant case, the question is whether the same act, error or omission caused both a water main leak and the water main break or whether there were two different acts, errors or omissions resulting in two separate claims and two distinct limitation periods.
The evidence presented in the summary judgment submissions indicated that the water main separated at a joint, which showed no signs of " 'wear markers' which would support[ ] a claim of long term leaking problems." That evidence implies that the joint that separated was not the source of a long-term leak. An engineering report indicated that the separation was caused by differential movement in the supporting soil, creating a factual question about the cause of such movement. The answer to that question could raise other factual questions as to whether the separation was caused by an act, error or omission by the District and whether it was related to the alleged water main leak. The facts need to be further developed before the beginning of the limitation period for the water main break can be established. Therefore, summary judgment was inappropriate on this issue.
Heimer , ¶¶ 29-30, 226 P.3d at 866.
[¶40] The same is true here. The affidavits of Harry Lawroski and Jeffrey Hobson show that disputed issues of fact exist concerning the question whether the 2006, 2007, and 2013 issues at PH III were related to a single act, error, or omission or separate acts. Moreover, those disputed issues of fact go directly to the question of when Pioneer's cause of action against Sargent was reasonably discoverable under Wyo. Stat. Ann. § 1-3-107(a)(i)(A). Lucky Gate never claimed protection under the section 107(a)(i) discovery rule exceptions to the two-year statute of limitations. Lucky Gate , ¶ 16, 208 P.3d at 64. We therefore reject Sargent's contention that Lucky Gate mandates summary judgment in favor of Sargent.
CONCLUSION
[¶41] Genuine issues of material fact existed as to when Pioneer should reasonably *1085 have been on notice that it needed to investigate the adequacy of the design, plans, and specifications for PH III. We therefore reverse the district court's order granting summary judgment and remand for further proceedings consistent with this opinion.

Pioneer Homestead Apartments III, Ltd., owns PH III and was also a named plaintiff in the action. For our purposes we will refer to Plaintiffs collectively as Pioneer.

Pioneer also named Kari Moulton, the structural engineer with Sargent who prepared the structural design plans for PH III, as a defendant in the action. We will refer to Sargent and Kari Moulton collectively as Sargent.

By a separate order filed October 10, 2017, the court dismissed Pioneer's claims against ZCM based on the parties' stipulation that those claims had been resolved by settlement agreement.

We agree with Pioneer that a party is not, as a matter of course and without cause, required to hire additional professionals to double-check the work of its paid professionals. See Bredthauer v. Christian, Spring, Seilbach & Assoc. , 824 P.2d 560, 563 (Wyo. 1992) (plaintiffs "could properly rely upon the accuracy of existing land surveys until they discovered those surveys were unreliable"); see also Thorne v. Johnson , 483 S.W.2d 658, 663 (Mo. Ct. App. 1972) ("It would be absurd to lay down as a legal requirement that these parties, in addition to hiring a professional abstractor, should also have to make their own independent laymen's investigation to ascertain whether their professional agent had done its job properly.").

The district court found Pioneer offered no "admissible evidence" in opposition to Sargent's summary judgment motion. The court's ruling provides no indication of why it ruled Harry Lawroski's affidavit inadmissible, assuming that it did. If the concern was that his statements were hearsay, presumably learned from the person who in fact identified the problem and solution, we disagree. The question for purposes of the discovery rule is not Mr. Lawroski's or Pioneer's personal knowledge of what in fact allowed the birds entry into the attic but instead what they understood to be the cause. That understanding bears on the question of whether it was reasonable to believe the problem was minor and resolved. Mr. Lawroski, as a member of the Pioneer Board of Directors, was competent to testify as to his understanding of the cause and whether that led him or the board to question the PH III engineering design. His statements regarding his understanding of what caused the birds to be in the attic were not offered for the truth of the matter asserted (the cause), and should not have been excluded as hearsay, if that was the ruling. See W.R.E. 801(c). As one authority explains:
A statement that D made a statement to X is not subject to attack as hearsay when its purpose is to establish the state of mind thereby induced in X, such as receiving notice or having knowledge or motive, or to show the information which X had as bearing on the reasonableness, good faith, or voluntariness of subsequent conduct, or on the anxiety produced.
2 McCormick on Evidence § 249 (7th ed.) (June 2016 update) (footnotes omitted); see also Paden v. Paden , 2017 WY 118, ¶ 25, 403 P.3d 135, 143 (Wyo. 2017) (quoting 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:18 (4th ed. June 2017 update) ) (upholding admissibility of letters that were not admitted to prove the truth of what was said, but rather as " 'verbal acts' in the sense that they have legal significance independent of their assertive quality...."); King v. Cowboy Dodge, Inc. , 2015 WY 129, ¶ 11 n.6, 357 P.3d 755, 758 n.6 (Wyo. 2015) (quoting 4 Mueller & Kirkpatrick, Federal Evidence § 8:18) (finding statement employee attributed to his physician to be a "verbal act" rather than hearsay because it was offered not for the truth of the matter asserted but as "words of independent legal significance").

We again do not know from the district court's decision why it rejected the Hobson affidavit. It is not clear if the court ruled the affidavit inadmissible, or the basis for that ruling if it in fact considered it inadmissible.

Mr. Hobson's affidavit was of course not inadmissible because it stated an opinion that embraces the ultimate issue to be decided by the trier of fact. See W.R.E. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.").