# THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 67

APRIL TERM, A.D. 2022

June 7, 2022

JTL GROUP, INC., d/b/a KNIFE RIVER, a
Wyoming corporation and ROADWORX
INDUSTRIES, LLC, a Wyoming limited
liability company,

Appellants
(Defendants),

v.

TANGNEY GRAY-DOCKHAM, as Wrongful
Death Representative of William C. Gray, Jr.,

Appellee
(Plaintiff).

S-21-0203

*Appeal from the District Court of Natrona County*
*The Honorable Kerri M. Johnson, Judge*

*Representing Appellants:*
>   Kendra N. Beckwith, Mark B. Collier of Messner Reeves LLP, and Tyler J. Garrett
>   of Hathaway & Kunz LLP.  Argument by Ms. Beckwith and Mr. Garrett.

*Representing Appellee:*
>   R. Todd Ingram and Grant Harvey Lawson of Metier Law Firm, LLC.  Argument
>   by Mr. Ingram.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

Tangney Gray-Dockham, wrongful death representative for William C. Gray, Jr., brought a negligence claim against JTL Group, Inc., doing business as Knife River ("Knife River") and RoadWorx Industries, LLC ("RoadWorx") (collectively referred to as "Appellants"), for the wrongful death of Mr. Gray following a motorcycle-vehicle collision in a construction work zone. Ms. Gray-Dockham alleged Appellants caused the accident by their negligent placement of the temporary traffic control devices in the work zone.

[¶1]    At the close of Ms. Gray-Dockham's case, Appellants moved for judgment as a matter of law contending any claim of direct negligence against Knife River was barred because it admitted vicarious liability on behalf of RoadWorx. Appellants also argued the evidence was insufficient to establish the temporary traffic control caused the accident. The district court denied the motion, and the jury returned a verdict against Appellants. Appellants renewed their motion for judgment as a matter of law and requested a new trial. The district court denied the motion. We affirm.

## ISSUES[1]

[¶2]    Appellants present two issues on appeal, which we rephrase as follows:

    I.       Did the district court err when it denied Appellants' renewed motion for judgment as a matter of law?

    II.      Was there sufficient evidence to support the temporary traffic control proximately caused the traffic accident?

---

[1] As a separate issue, Ms. Gray-Dockham requests this Court award her attorney fees and impose sanctions pursuant to Rule 10.05(c). Ms. Gray-Dockham contends Appellants filed a brief containing misrepresentations and omissions. Specifically, she alleges Appellants misrepresented the nature of her claims and their "overall appeal lacks cogent argument, fails to cite pertinent authority, and fails to adequately cite the record." Rule 10.05(c) is generally designed to protect appellees from frivolous or meritless appeals. *Cornella v. City of Lander*, 2022 WY 9, ¶ 29, n. 6, 502 P.3d 381, 388 (Wyo. 2022). We acknowledge Appellants filed an errata and modified their opening brief. However, after reviewing the briefs, errata and record, we cannot certify Appellants' brief contains misrepresentations or omissions. While we do not find Appellants' arguments persuasive, we do find Appellants had reasonable cause for appeal and that they presented cogent argument, cited to pertinent legal authority and the relevant portions of the record. We therefore decline Ms. Gray-Dockham's request. *See generally Lemus v. Martinez*, 2021 WY 66, ¶ 42, 486 P.3d 1000, 1012 (Wyo. 2021) (declining to award Rule 10.05 sanctions because even though Father's appellate arguments were not persuasive we could not "certify that he had no reasonable cause for his appeal" or that he did not present cogent argument or proper citation) (citing *Marquis v. Marquis*, 2020 WY 141, ¶ 52, 476 P.3d 212, 224 (Wyo. 2020); *Carbaugh v. Nichols,* 2014 WY 2, ¶ 24, 315 P.3d 1175, 1180 (Wyo. 2014)).

1

## FACTS

[¶3]   In December 2016, the Wyoming Department of Transportation ("WYDOT) awarded Knife River a construction bid for a pavement surfacing project in Casper, Wyoming.   Knife River entered into a contract with the Wyoming Transportation Commission[2] to be the general contractor on the project.  The project required pavement rehabilitation on approximately 4.06 miles of road on Yellowstone Highway.  Pavement activities began at the bridge located off the exit at Interstate 25 and Yellowstone Highway and continued to the east past Hat Six Road.  At the intersection of Hat Six and Cole Creek Road, WYDOT requested Knife River to narrow the lanes from a divided four lane highway into a five-lane section.  Additionally, WYDOT requested a traffic signal be placed at that same intersection.

[¶4]   The contract assigned Knife River with the responsibility to set up temporary traffic control in the work zone.  Knife River in turn entered into a subcontract with RoadWorx. Under the subcontract, RoadWorx was to "furnish all supervision, labor, tools, equipment, materials and supplies necessary to perform . . . flagging [and] temporary traffic control." Traffic control is a mechanism used to protect the public, work force and equipment by guiding and directing the public safely through a construction project.  Changes in a roadway during construction make it imperative to provide motorists with clear guidance on how to safely navigate the work zone by using appropriate traffic control devices to warn, guide or channelize motorists or road users.

[¶5]   All WYDOT construction projects require a traffic control supervisor onsite.  A traffic control supervisor is the individual "responsible for designing all of the necessary traffic control for the construction operations on a day-to-day basis, depending on what the prime contractor and maybe other subcontractors' needs are."   Additionally, a traffic control supervisor is responsible for setting up the traffic control devices and monitoring the function once in place.  To qualify as a traffic control supervisor, an individual must become certified through WYDOT's certification process.  On this project, an employee of RoadWorx, Consuela Garcia, was certified and contracted to serve as the traffic control supervisor.   While not required by Knife River or WYDOT, Knife River's project superintendent, Dennis Hallford was also certified by WYDOT as a traffic control supervisor.

[¶6]   Although Knife River subcontracted with RoadWorx to perform all traffic control, it elected to have WYDOT direct all communications with respect to traffic control to its employee and project superintendent, Mr. Hallford.  Knife River directed WYDOT to communicate any issues to Mr. Hallford and not to the subcontractors.  Indeed, if WYDOT relayed any issues to Mr. Hallford, he was required under the contract to act as the

---

[2] The Wyoming Transportation Commission governs the activities of the Wyoming Department of Transportation.  Wyo. Stat. Ann. § 24-2-101 (LexisNexis 2021).

middleman and relay any such matters to RoadWorx. Furthermore, Mr. Hallford was "to be the focal point for all safety matters" and to oversee the traffic control implemented by RoadWorx. Both Knife River and RoadWorx were required to set up traffic control in strict conformity with the contract and WYDOT's project plans.

[¶7]   On the morning of September 12, 2017, Jack Stone, a resident engineer with WYDOT, inspected the traffic control on the project. The day before, without direction from Knife River, RoadWorx removed the traffic control devices from the eastbound lane on Yellowstone Highway. After observing there was no traffic control in the eastbound lane, Mr. Stone drove to the WYDOT office to retrieve WYDOT's district traffic engineer, Mark Williams. Mr. Williams and Mr. Stone drove through the project and identified several deficiencies in the traffic control layout.

[¶8]   After identifying the deficiencies, Mr. Stone completed a project mobility review to inform Knife River the traffic control needed to be addressed. On the project mobility review, Mr. Stone noted: (1) the lane closures were unacceptable; (2) there were unnecessary or confusing signs; and (3) the overall rating of traffic control was unacceptable. Additionally, Mr. Stone listed the following deficiencies:

> Left turn lanes at the paved median locations need to be added. Specifically, there is no [eastbound] left turn lane at Curtis or Hat Six. The [westbound] left turn lane at Hat Six is not properly delineated. Need [eastbound] lane closure where 2 lanes become one at Hat Six. Remove the 30 mph speed limit signs in the 5 lane section and uncover the existing 40 mph speed limit signs in both directions of travel.

[¶9]   After Mr. Stone completed the project mobility review, he met with Mr. Hallford to discuss the traffic control deficiencies. Mr. Stone informed Mr. Hallford the eastbound and westbound left turn lanes at the Hat Six and Cole Creek intersection needed to be corrected. He requested traffic control at the intersection be set up similar to the setup during the solar eclipse on August 21–23, 2017. He further requested Mr. Hallford to first correct the deficiencies at the intersection because that location had the majority of traffic control problems.

[¶10]  Mr. Hallford met with Ms. Garcia and informed her of what needed to be corrected with the traffic control. Ms. Garcia and her crew physically moved the traffic control devices in accordance with Mr. Hallford's instructions. Mr. Hallford never physically moved the traffic control devices, but he directly relayed WYDOT's instructions to RoadWorx about what needed to be corrected.

[¶11]  After her crew made the requested changes, Ms. Garcia informed Mr. Hallford the traffic control was corrected. Mr. Hallford and Ms. Garcia traveled to each location and

verified the corrections were made. Mr. Hallford inspected the traffic control at the intersection and approved the setup. Mr. Hallford signed the project mobility review to indicate the deficiencies were corrected by 11:00 a.m. He further sent the signed project mobility review to Knife River's office to ensure Knife River and WYDOT knew he inspected the repairs and the changes were made.

[¶12] On this same day, September 12, 2017, at approximately 6:00 p.m., Lana Simmons was driving home with her three children. Ms. Simmons was traveling eastbound on Yellowstone Highway and merged into the farthest left lane to prepare to turn left at the intersection onto Cole Creek from Yellowstone Highway. To make a left turn, Ms. Simmons came to almost a complete stop at the end of the last traffic control device, a barrel with a left turn sign. Before beginning her turn, she noticed a white car directly in front of her vehicle in the same lane making a left turn in the opposite direction from the westbound lane on Yellowstone Highway. She thought the white car had the right-of-way, so she waited until that car turned through the intersection before proceeding to turn. Ms. Simmons turned left into the intersection from the end of the traffic control barrels. When she began to turn, she realized she was turning into the wrong lane of travel on Cole Creek. Consequently, Ms. Simmons made a subtle correction that she identified as an "s" or "zig-zag" maneuver to adjust her vehicle's travel to turn into the correct lane.

[¶13] At this point, Ms. Simmons heard a loud noise, the air bags went off, and her vehicle came to a complete stop. Ms. Simmons collided head-on with William Gray, Jr., who was traveling westbound on Yellowstone Highway. The posted speed limit at the time of the accident was 40 miles per hour. Mr. Gray was traveling approximately 37 to 42 miles per hour on a motorcycle, and Ms. Simmons was traveling approximately 12 to 20 miles per hour in a Buick four-door-passenger vehicle.

[¶14] Mr. Gray suffered extensive injuries from the accident. He was life-flighted from Wyoming Medical Center in Casper to a hospital in Denver, Colorado. He was hospitalized for sixteen days before succumbing to his injuries.

[¶15] Ms. Gray-Dockham filed a complaint in the Seventh Judicial District, Natrona County, Wyoming, against Appellants. She alleged Appellants "failed to exercise ordinary care[] and are liable for their own independent negligent and reckless acts and omissions." She further alleged "Knife River is vicariously liable for the negligence, recklessness, and/or willful and wanton misconduct" of RoadWorx. Specifically, Ms. Gray-Dockham claimed Appellants disregarded their duty to implement reasonably safe traffic control at the intersection of Hat Six and Cole Creek.

[¶16] A seven-day jury trial was held in April 2021. Ms. Gray-Dockham's expert witness, Jay Przybyla, a forensic engineer specializing in accident reconstruction and transportation safety, opined the traffic control at the intersection was an atypical setup, and the corrections requested by WYDOT in the project mobility review were not properly

4

completed. At time of the accident, Ms. Simmons was in a large, paved intersection with no markings or signals. One deficiency was the location of the stop bar (the last barrel) in the eastbound left turn lane, which required Ms. Simmons to begin her left turn more than thirty-five feet back from the beginning of the intersection. Ms. Simmons began her left turn too soon due to the position of the last traffic control barrel, and when she realized her error, she tried to correct her path.

[¶17] The diagrams below were created by Mr. Przybyla to show the temporary traffic control setup and the turn and correction Ms. Simmons was required to make due to the location of the last traffic control barrel.





[¶18]  Mr. Przybyla opined the subtle corrective maneuver made by Ms.  Simmons likely caused Mr. Gray to assume Ms. Simmons saw him and was moving out of the through lane of traffic.  Ian Noy, Ph.D., a consultant in forensic human factors, testified Ms. Simmons was so intently focused on trying to place her vehicle in the appropriate lane that it basically drew most of her attention or resources, which left very few resources to monitor conflicting traffic or look for hazards.  Testimony established that more guidance on how to navigate the intersection would have allowed Ms. Simmons to detect opposing traffic and notice Mr. Gray.  Additionally, testimony revealed the improper placement of the last barrel caused Ms. Simmons to make an atypical left turn, which required her to take corrective measures and elongated the time she was in the intersection.

[¶19]  At the close of Ms. Gray-Dockham's case-in-chief, Appellants moved for judgment as a matter of law.  The district court denied the motion and found there was sufficient evidence for the jury to determine if Knife River and/or RoadWorx were negligent in setting up the traffic control and whether the traffic control caused the accident.  The verdict form included RoadWorx, Knife River, and Lana Simmons.  Appellants did not object to the verdict form.[3]  The jury found RoadWorx, Knife River, and Ms. Simmons at fault and

---

[3] We note there is nothing in the record to indicate an objection to other potential actors, such as WYDOT and Mr. Gray, not being included on the verdict form.  *See generally* Wyo. Stat. Ann. § 1-1-109(c)(i)(A) (LexisNexis 2021) ("Whether or not the claimant is free of fault, the court shall . . . [d]irect the jury to determine . . . the percentage of fault attributable to each actor.");  *Pinnacle Bank v. Villa*, 2004 WY 150, ¶¶ 16–19, 100 P.3d 1287, 1292–94 (Wyo. 2004) (holding a non-party State actor when it acts negligently and fails to use reasonable care can be considered by the jury in its comparative fault analysis); *Matter of SGN*, 2022 WY 38, ¶ 16, 506 P.3d 748, 752–53 (Wyo. 2022) ("Because the issue was not raised or briefed, we do not [address] it.").

allocated the percentage of fault as follows: (1) 30% to RoadWorx; (2) 60% to Knife River; and (3) 10% to Ms. Simmons. The jury found there was no willful or wanton misconduct on behalf of Knife River or RoadWorx, so it did not award any punitive damages. In accordance with the jury's award, the district court entered judgment against Knife River and RoadWorx.

[¶20] Appellants renewed their motion for judgment as a matter of law and requested a new trial. The district court denied the motion and found "the verdict is sustained by sufficient evidence and no error of law occurred at trial." Appellants timely perfected this appeal.

## DISCUSSION

[¶21] Appellants argue the district court erred when it denied their renewed motion for judgment as a matter of law under Rule 50 of the Wyoming Rules of Civil Procedure ("W.R.C.P.") and when it denied their W.R.C.P. 59(a) motion for new trial.

### I.    Judgment as a Matter of Law

[¶22] Appellants contend the district court erred as a matter of law when it allowed Ms. Gray-Dockham to pursue claims for both direct negligence and vicarious liability against Knife River. They suggest any theory of direct negligence against Knife River was improper under *Bogdanski v. Budzik*, 2018 WY 7, ¶¶ 19–26, 408 P.3d 1156, 1161–64 (Wyo. 2018), because it admitted vicarious liability for RoadWorx's alleged negligence. Accordingly, Appellants argue the district court erred when it included Knife River separately on the verdict form because it subjected Knife River to double allocation of liability contrary to *Bogdanski*.

[¶23] "Judgment as a matter of law under Wyoming Rule of Civil Procedure 50 should be granted cautiously and sparingly." *Mgmt. Nominees, Inc. v. Skowronska*, 2019 WY 105, ¶ 20, 450 P.3d 672, 678 (Wyo. 2019). "We review the decision to grant or deny judgment as a matter of law de novo." *Id.* We undertake a full record review without weighing the credibility of witnesses or considering the weight of evidence. *Wageman v. Harrell*, 2020 WY 143, ¶ 6, 476 P.3d 657, 659 (Wyo. 2020). Our review of the record affords no deference to the district court's conclusion and instead "focuses on whether the evidence is such that reasonable persons could reach but one verdict." *Mgmt. Nominees, Inc.*, ¶ 20, 450 P.3d at 678. "The evidence is viewed in the light most favorable to the nonmoving party, and that party is given the benefit of all reasonable inferences that may be drawn from it." *Merit Energy Co., LLC v. Horr*, 2016 WY 3, ¶ 34, 366 P.3d 489, 498 (Wyo. 2016). "When the evidence permits more than one reasonable inference or the inferences favorable to the moving party are subject to doubt, the matter is properly for the jury to decide and a motion for judgment as a matter of law must be denied." *Mgmt. Nominees, Inc.*, ¶ 20, 450 P.3d at 678.

[¶24] In *Bogdanski*, we adopted the *McHaffie* rule and held when the liability of the principal is wholly dependent on the negligence of the agent and the principal admits vicarious liability, then any cause of action for direct negligence against the principal becomes duplicative and cannot be pursued. ¶¶ 22–23, 408 P.3d at 1162–63. Relying on *Bogdanski*, Appellants suggest Knife River's "liability was completely predicated upon a finding that RoadWorx was negligent." Therefore, the admission of vicarious liability for RoadWorx's negligence barred any direct negligence claim against Knife River. We find Knife River's reliance on *Bogdanski* is misplaced. *Bogdanski* does not stand for the broad proposition a principal can never be listed on the verdict form for a direct negligence claim, particularly when the actions of the principal are separate and independent from the agent's actions.

[¶25] In *Bogdanski*, a plaintiff codriver of a commercial semi-truck was injured in a rear-end collision and sued his codriver and FedEx. ¶¶ 3–11, 408 P.3d at 1157–59. FedEx was the owner of the trailer being hauled on the semi-truck, but it did not own the semi-truck and was not the codriver's employer. *Bogdanski*, 2018 WY 7, ¶ 5, 408 P.3d at 1158. The plaintiff codriver and defendant codriver were employed as commercial truck drivers by a separate trucking company that owned the semi-truck and had an independent contract with FedEx to haul FedEx's trailers. *Id.* at ¶¶ 3–5, 408 P.3d at 1157–58. The plaintiff codriver alleged negligence against both the defendant codriver and FedEx and vicarious liability against FedEx. *Id.* at ¶¶ 10–11, 408 P.3d at 1159. FedEx filed a stipulation stating if the semi-truck was determined to be negligently operated by the defendant codriver, then FedEx was responsible for any such negligence under its contract. *Id.* at ¶ 12, 408 P.3d at 1159. Based on this stipulation, FedEx asserted the plaintiff codriver could not proceed on any direct negligence claim against FedEx. *Id.* at ¶ 14, 408 P.3d at 1160.

[¶26] The claims against FedEx were wholly tethered to the defendant codriver's tortious acts, and since FedEx conceded it was subject to liability for those acts, the direct negligence claims against FedEx became superfluous. *Bogdanski*, 2018 WY 7, ¶¶ 21–26, 408 P.3d at 1162–64. There was no act or omission on the part of FedEx or its own employee for which it could be liable under a direct negligence claim that was wholly independent from the actions of the defendant codriver. *Id.* Accordingly, because there was no separate act or omission by FedEx, we found when FedEx stipulated to liability for the defendant codriver's negligence, the plaintiff codriver could not pursue a direct negligence claim against FedEx. *Id.* As stated in *McHaffie*:

> The reason given for holding that it is improper for a plaintiff to proceed against an owner of a vehicle on the independent theory of imputed negligence where *respondeat superior* is admitted has to do with the nature of the claim. Vicarious liability or imputed negligence has been recognized under varying theories, including agency, negligent entrustment of a

8

chattel to an incompetent, conspiracy, the family purpose doctrine, joint enterprise, and ownership liability statutes. If all of the theories for attaching liability to one person for the negligence of another were recognized and all pleaded in one case where the imputation of negligence is admitted, the evidence laboriously submitted to establish other theories serves no real purpose. The energy and time of courts and litigants is unnecessarily expended. In addition, potentially inflammatory evidence comes into the record which is irrelevant to any contested issue in the case. Once vicarious liability for negligence is admitted under *respondeat superior,* **the person to whom negligence is imputed becomes strictly liable to the third party for damages attributable to the conduct of the person from whom negligence is imputed.** The liability of the employer is fixed by the amount of liability of the employee. This is true regardless of the "percentage of fault" as between the party whose negligence directly caused the injury and the one whose liability for negligence is derivative.

**Having said that, it may be possible that an employer or entrustor may be held liable on a theory of negligence that does not derive from and is not dependent on the negligence of an entrustee or employee.** In addition, it is also possible that an employer or an entrustor may be liable for punitive damages which would not be assessed against the employee/entrustee. Finally, it is conceivable that in a contribution action between an employer and employee, the relative fault of those two parties may be relevant. However, none of those circumstances exist here.

McHaffie By and Through McHaffie v. Bunch, 891 S.W.2d 822, 826 (citations omitted) (emphasis added).

[¶27] Appellants admit there is evidence of direct negligence by Knife River's own employee, separate and independent from RoadWorx's tortious conduct. Indeed, Knife River acknowledges there is evidence in the record that its "project superintendent, Dennis Hallford, negligently instructed and approved the work of RoadWorx's traffic control supervisor, Consuela Garcia." Nevertheless, Appellants contend any liability on behalf of Knife River is wholly dependent upon RoadWorx's acts in setting up the traffic control. Appellants suggest Mr. Hallford's acts amount only to negligent supervision, so any direct negligence claim against Knife River is barred because "it concerns the 'same activity' for which Knife River already admitted vicarious liability."

9

[¶28] Appellants' contentions ignore Wyoming's comparative fault scheme. Our comparative fault statute mandates the jury to determine "the percentage of fault attributable to each **actor**." Wyo. Stat. Ann. § 1-1-109(c)(i)(A) (LexisNexis 2021) (emphasis added). An "actor" is defined as "a person or other entity, including the claimant, whose fault is determined to be a proximate cause of the death, injury or damage, whether or not the actor is a party to the litigation[.]" Wyo. Stat. Ann. § 1-1-109(a)(i). "'Fault' includes acts or omissions, determined to be a proximate cause of death or injury to person or property, that are in any measure negligent, or that subject an actor to strict tort or strict products liability, and includes breach of warranty, assumption of risk and misuse or alteration of a product[.]" Wyo. Stat. Ann. § 1-1-109(a)(i). As seen by the plain language of the statute, the Wyoming legislature determined it is the jury's responsibility to apportion the percentage of fault attributable to each "actor," which facilitates the legislature's objective to hold each defendant liable only for his proportion of fault. *Pinnacle Bank v. Villa*, 2004 WY 150, ¶ 16, 100 P.3d 1287, 1293 (Wyo. 2004).

[¶29] We tangentially touched on the independent negligence of an employer or agent against the backdrop of Wyoming's comparative negligence statute in *Beavis v. Campbell County Memorial Hospital*, 2001 WY 32, ¶¶ 19–22, 20 P.3d 508, 515–17 (Wyo. 2001). *Beavis* involved the alleged negligent injection of allergy medicine by a nurse. ¶ 3, 20 P.3d at 510. The plaintiff brought suit against the nurse, her supervising doctor, and her employer, the hospital. *Id.* at ¶¶ 3–4, 20 P.3d at 510. The trial court bifurcated the claims against the nurse from the claims against her supervising doctor and the hospital and limited the issue at trial to whether the nurse properly performed the injection and what damages, if any, occurred as a result. *Id.* at ¶ 5, 20 P.3d at 510–511. The jury returned a verdict in favor of the defendant nurse. *Id.* at ¶¶ 6–7, 20 P.3d at 511. Thus, the district court entered judgment in favor of the defendants on all claims, including those against the supervising doctor and hospital. *Id.*

[¶30] We affirmed entry of the judgment and found the claims against the hospital and supervising doctor "rest on the predicate of [the nurse's] negligence." *Beavis*, 2001 WY 32, ¶¶ 19–22, 20 P.3d at 515–517. We found there was no independent claim of negligence made against the supervising doctor because there was no allegation the supervising doctor "should not have prescribed any medicine, that he prescribed the wrong medicine, that he ordered an improper dosage, that he ordered it injected into an improper location, or anything of the sort." *Id.* at ¶ 20, 20 P.3d at 516. Indeed, we reiterated the only claim against the supervising doctor was that he "failed to train or supervise [the nurse] in administering the injection" and therefore "even assuming [the supervising doctor] was negligent in the manner [claimed], i.e., breached some duty in failing to supervise or train [the nurse], it is clear his negligence could not be the proximate cause [of plaintiff's] injuries unless the predicate negligence of [the nurse] was found." *Id.* at ¶ 20, 20 P.3d at 516. Accordingly, under the facts of *Beavis* there was no need to allocate fault to the supervising doctor or the hospital because any alleged negligent action could not be

considered the proximate cause of plaintiff's injuries without the connected negligent act or omission on the part of the nurse. *Id.* at ¶¶ 19–22, 20 P.3d at 515–517.

[¶31]  When analyzing whether our decision was consistent with Wyoming's comparative fault statute, we said:

> Although the parties spend little time discussing comparative fault, we believe this case must be analyzed consistently with the Wyoming Comparative Fault Statute, Wyo. Stat. Ann. § 1–1–109 (Lexis 1999), in order to uphold the legislative mandate on comparative fault.  We therefore must address the Beavises' contention, which is captured in a pretrial memorandum:
>
>> It is possible for the jury in this case to determine that even though Defendant Hazlett performed the injective process in the wrong way, that considering her lack of qualifications that she was not negligent, but that Defendant Horan and Defendant CCMH were negligent and consequently liable in failure of hiring, training, qualifications, retention, and supervision....
>
> This argument does have some logical appeal, and we agree that, had the Beavises established that Hazlett performed the injective process in the wrong way or was "in any measure negligent," Wyo. Stat. Ann. § 1–1–109(a)(iv), they would have later been entitled to establish their claims against CCMH and Dr. Horan and been entitled to a jury determination on comparative fault.  **However, because the claims against CCMH and Dr. Horan rest on the predicate of Hazlett's alleged negligence, we find no error in entry of judgment on the claims against those two parties.**

*Beavis*, 2001 WY 32, ¶ 22, 20 P.3d at 516–17 (emphasis added).

[¶32]  We have carefully reviewed the entire record designated by the parties.[4]  Viewing the evidence in a light most favorable to Ms. Gray-Dockham and giving her all reasonable

---

[4] During their testimony, each expert witness used a demonstrative power point presentation to help aide the jury.  The record on appeal does not contain any of the demonstrative power point presentations to aide in our review of the trial transcript.  "While it is a common practice for demonstrative evidence to be displayed and referred to without formally being admitted into evidence, the formal offering and introduction of demonstrative evidence into the record as part of the witness' testimony is preferred."  Michael H. Graham, 2 *Handbook of Federal Evidence* § 401:2 (9th ed. Nov. 2021).  "The clearly preferable

inferences that may be drawn from it, we conclude the evidence presented the jury with a question as to the percentage of fault attributable to Knife River. Unlike *Bogdanksi* and *Beavis*, Knife River's liability with respect to its project superintendent, Mr. Hallford, and its own actions in mandating WYDOT communicate directly with Mr. Hallford, is not wholly dependent on the negligence of RoadWorx and its employees, nor is its liability fixed by the amount of RoadWorx's liability.

[¶33] Knife River had the ability to decide whether it wanted WYDOT to communicate directly with its subcontractors. Instead of requesting WYDOT communicate directly with RoadWorx, Knife River elected to have WYDOT communicate any issues concerning traffic control directly with Mr. Hallford, who then relayed the information to RoadWorx. Mr. Hallford was required to be the "focal point for all safety matters." Accordingly, he set up weekly safety meetings and had weekly meetings with Mr. Stone concerning traffic control. At such meetings, Mr. Stone would relay problems with traffic control, and Mr. Hallford would then meet with Ms. Garcia and discuss what traffic control needed to be addressed.

[¶34] RoadWorx followed Mr. Hallford's directives. Ms. Garcia testified Mr. Hallford gave her instructions on how to set up the traffic control, and she did what Mr. Hallford told her to do. She relied upon Mr. Hallford to explain any traffic control changes or concerns. Additionally, as WYDOT identified, Knife River's project superintendent "control[s] and direct[s] the traffic control supervisor on a project."

[¶35] On the date before the accident, RoadWorx removed the traffic control devices from the eastbound lane. After noticing the errors the next morning, Mr. Stone completed a project mobility review. The project mobility review alerted Knife River to the problems with the traffic control. Mr. Stone gave the project mobility review to Mr. Hallford, and they discussed the problems. WYDOT never met with any employee of RoadWorx. Ms. Garcia testified she never saw or received the project mobility review. Instead, she corrected the traffic control based on the directions she received from Mr. Hallford. After she corrected the traffic control, Mr. Hallford inspected it. Mr. Hallford testified that he went to each location to inspect the traffic control and signed the project mobility review to indicate he confirmed the changes to traffic control were made.

[¶36] We conclude the evidence, when viewed in the light most favorable to Ms. Gray-Dockham, permitted more than one reasonable inference as to whether the harm was caused by an act or omission committed by Knife River's project superintendent, Mr. Hallford, pursuant to orders or directions negligently given, and that inferences favorable to Knife River were subject to doubt. The issue was therefore for the jury to decide, and

---

practice is for the proponent to offer a demonstrative aid into evidence as an exhibit, to authenticate it by the testimony of a witness, and formally to introduce it as part of the witness's testimony, in which it will be incorporated by reference." 2 *McCormick on Evidence* § 214 (8th ed. Jan. 2020).

the jury was mandated to allocate the percentage of fault attributable to each actor, including Knife River. Wyo. Stat. Ann. § 1-1-109(c)(i)(A). Accordingly, the district court did not err when it denied Knife River's renewed motion for judgment as a matter of law, and Knife River was properly included on the verdict form.

## II.     *Motion for New Trial – Sufficiency of the Evidence*

[¶37] For their second issue, Appellants argue a new trial is warranted pursuant to W.R.C.P. 59(a)(1)(F) because the verdict is not sustained by sufficient evidence. Appellants contend there was not a legally sufficient evidentiary basis to find in favor of Ms. Gray-Dockham on the element of causation. Specifically, Appellants argue the temporary traffic control was not a substantial factor in causing the accident because the accident was caused by Ms. Simmon's concentration on the "keep right" barrel, which prevented her from noticing Mr. Gray. Appellants claim the temporary traffic control furnished only the condition or occasion for the accident, but it is not the proximate cause of the accident.

[¶38] "In reviewing the sufficiency of the evidence to support a jury's verdict, we assume the evidence in favor of the successful party is true, leave out consideration of conflicting evidence, and afford the successful party every favorable inference that may reasonably and fairly be drawn from it." *Mgmt. Nominees, Inc.*, ¶ 21, 450 P.3d at 678 (citing *Landsiedel v. Buffalo Properties, LLC*, 2005 WY 61, ¶ 5, 112 P.3d 610, 612 (Wyo. 2005)). "As long as the jury's findings are supported by such evidence, we will not disturb its verdict." *Wageman*, ¶ 7, 476 P.3d at 659.

[¶39] "Negligence occurs when one fails to act as would a reasonable person of ordinary prudence under like circumstances." *Lucero v. Holbrook*, 2012 WY 152, ¶ 7, 288 P.3d 1228, 1232 (Wyo. 2012). "To establish negligence, a plaintiff must prove: '(1) the defendant owed the plaintiff a duty to conform to a specified standard of care; (2) the defendant breached the duty of care; (3) the breach proximately caused injury to the plaintiff; and (4) the injury is compensable by money damages.'" *Miller by & through Travis v. Sweetwater Cnty. Sch. Dist. #1*, 2021 WY 134, ¶ 15, 500 P.3d 242, 246–47 (Wyo. 2021) (quoting *Burns v. Sam*, 2021 WY 10, ¶ 8, 479 P.3d 741, 744 (Wyo. 2021)). To prove the third element, the conduct alleged as negligence must have been "a substantial factor in bringing about the plaintiff's injuries." *Wood v. CRST Expedited, Inc.*, 2018 WY 62, ¶ 10, 419 P.3d 503, 507 (Wyo. 2018) (emphasis omitted) (quoting *Lucero*, ¶ 17, 288 P.3d at 1234). The third element, proximate cause, focuses upon the foreseeability of the injury, which requires "the accident or injury must be the natural and probable consequence of the act of negligence." *Warwick v. Accessible Space, Inc.*, 2019 WY 89, ¶ 53, 448 P.3d 206, 221 (Wyo. 2019) (quoting *Foote v. Simek*, 2006 WY 96, ¶ 22, 139 P.3d 455, 463 (Wyo. 2006)).

13

The central goal of the proximate cause requirement is to limit the defendant's liability to the kinds of harms he risked by his negligent conduct. Judicial decisions about proximate cause rules thus attempt to discern whether, in the particular case before the court, the harm that resulted from the defendant's negligence is so clearly outside the risks he created that it would be unjust or at least impractical to impose liability.

. . .

The most general and pervasive approach to proximate cause holds that a negligent defendant is liable for all the general kinds of harms he foreseeably risked by his negligent conduct and to the class of persons he put at risk by that conduct. Conversely, he is not a proximate cause of, and not liable for[,] injuries that were unforeseeable. This does not mean that the defendant must be the sole proximate cause of the plaintiff's injury. On the contrary, several wrongdoers are frequently proximate causes of harm.

*Wood*, ¶ 9, 419 P.3d at 506–07 (quoting Dan B. Dobbs et al., *The Law of Torts* § 180, at 443−44 (2000)).

[¶40]   Applying this standard, the harm that resulted from Mr. Hallford's and Ms. Garcia's negligence is not so clearly outside the risks created that it would be unjust or at least impractical to impose liability on Appellants. *See generally Tatman v. Cordingly*, 672 P.2d 1286, 1288 (Wyo. 1983) ("[We] will not disturb the findings of the trier of fact unless the findings are so totally in conflict with the great weight of evidence that they can be said to be irrational."). Assuming the evidence in favor of Ms. Gray-Dockham is true, and disregarding contrary evidence, the evidence shows RoadWorx removed the traffic control devices from the eastbound lane after Knife River completed paving. When WYDOT noticed the traffic control was removed, it completed a project mobility review and noted the traffic control and lane closures at the intersection were unacceptable. WYDOT met with Mr. Hallford and told him to correct the traffic control at the intersection as follows: (1) the left turn lanes at the paved median locations needed to be added, noting there was no eastbound left turn lane turning onto Curtis Street; (2) the westbound left turn lane at Hat Six was not properly delineated; and (3) there needed to be an eastbound lane closure where two lanes become one at Hat Six. Mr. Stone informed Mr. Hallford "[t]he left turn lane at Hat Six needed to be set up like [they] did for the eclipse."

[¶41]   Mr. Stone requested the temporary traffic control create a through lane, a dedicated left turn lane, and a dedicated right turn lane, which included tapering for the dedicated turn lanes. On the day of the eclipse, the eastbound lane had one lane approaching in

14

advance of the intersection, which was the middle lane with a taper to the left and a taper to the right for dedicated left turn and right turn lanes. Additionally, the lanes were clearly delineated with temporary stripping. On the date of the accident, RoadWorx did not have the equipment to lay down temporary stripping. RoadWorx and Knife River were required under the plan specifications to use cones or barrels to delineate the lanes as an alternative to temporary stripping. While required, neither RoadWorx nor Knife River placed cones or barrels in lieu of the temporary stripping to clearly delineate the lanes. There were temporary chip seal markers on the road, but expert testimony indicates chip seal markers are not an acceptable way to delineate the lanes for traffic control.

[¶42] The last barrel, which signified the stop bar—the marking that indicates where a vehicle must stop—to turn left onto Cole Creek was incorrectly placed away from the intersection. While Mr. Hallford testified the barrels were placed back from the intersection because it was an industrial area and semi-trucks were hitting the barrels when they turned, Mr. Przybyla testified the barrels were placed another thirty-five feet away from the intersection when compared to where the last barrel was placed on the date of the eclipse. This setup led Ms. Simmons to stop further back from the intersection and dramatically elongated the time she was in the intersection while turning. Furthermore, Mr. Przybyla opined the traffic control guidance caused Ms. Simmons to begin turning into the wrong lane requiring her to readjust her vehicle while in the intersection. Mr. Przybyla opined that Ms. Simmons did not see Mr. Gray because she was cognitively occupied with turning into the proper lane after realizing she was turning into the wrong lane. Ms. Simmons confirmed this theory when she testified she was concentrated on the "keep right" barrel placed on the road she was turning into. Additionally, Dr. Noy opined Ms. Simmons was so intently focused on trying to place her vehicle in the appropriate lane that it drew most of her attention or resources away from monitoring conflicting traffic.

[¶43] Ultimately, Mr. Przybyla opined placing the barrels for the turn lane all the way to the intersection would have provided Ms. Simmons with the proper guidance for a normal left turn and prevented Ms. Simmons from remaining in the intersection. This is further supported by Dr. Noy's opinion that with more guidance on how to properly navigate the intersection, Ms. Simmons would have been more readily apt to detect opposing traffic and notice Mr. Gray. Additionally, while the Appellants' expert witness Jerry Ogden, Ph.D., opined nothing about the traffic control setup caused the accident, he admitted his analysis did not account for Ms. Simmons stopping at the last barrel or for the subtle "s" or "zig-zag" maneuver she made in the intersection.

[¶44] We find the jury could reasonably conclude from this evidence the temporary traffic control was a substantial factor in causing the accident. Therefore, we will not disturb the jury's verdict.

15

## CONCLUSION

[¶45]   The evidence supported a reasonable inference the accident was caused by an act or omission committed by Knife River's employee, Mr. Hallford, which was separate and independent of any acts or omissions by RoadWorx's employees.  Based on this evidence, the district court did not err as a matter of law when it placed both Knife River and RoadWorx on the verdict form.

[¶46]   Further, the jury could reasonably conclude from the evidence the temporary traffic control proximately caused the accident.  We therefore affirm the jury's verdict and judgment of the district court.